UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-20185-CR-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

v.

MARIO RENE DE LA TORRE and
JOE LEWIS MCHOMES,

    Defendants.
_____/

### DEFENDANT MARIO DE LA TORRE'S SENTENCING MEMORANDUM AND MOTIONS FOR DOWNWARD DEPARTURE AND VARIANCE FROM THE GUIDELINES

Defendant Mario De La Torre, through undersigned counsel, respectfully submits this memorandum in aid of sentencing. Upon consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), a noncustodial sentence is the just and proper sentence for Mr. De La Torre.

### INTRODUCTION

Mario De La Torre is a 54-year-old husband and father with no criminal history and no history of violence. He is scheduled to be sentenced by this Court on June 27, 2024, having pleaded guilty to Counts One and Fourteen of the Superseding Indictment charging him with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, and making and subscribing a false tax return in violation of 26 U.S.C. § 7205(1).[1] (DE 6, 110). The Second Addendum to the

---

[1] Counts 2, 3, 4, 5, 7, 8, 9, 10, and 13 were previously dismissed by Court Order dated April 6, 2023 (DE 103), which Order partially adopted the Report and Recommendations of Magistrate Judge Torres dated October 21, 2022 (DE 71). The Government has agreed to dismiss Counts 6, 11, and 12 after sentencing. (DE 110 ¶ 2).

Presentence Investigation Report ("PSI") recognizes Mr. De La Torre's zero-point offender status under U.S.S.G. § 4C1.1, and has assigned a total offense level of 20, carrying with it an advisory guidelines range of 33 to 41 months' imprisonment. (DE 132-2 at 1). Taking into consideration the factors under 18 U.S.C. § 3553, however – chiefly, Mr. De La Torre's history and characteristics, the nature and circumstances of his offense, the unique factual and procedural history of this case, the need to avoid unwarranted sentencing disparities, and his non-existent risk of recidivism – we respectfully urge this Court to impose a noncustodial sentence.

## DISCUSSION

**I.    AS A ZERO POINT OFFENDER, MR. DE LA TORRE IS ENTITLED TO A TWO-LEVEL DOWNWARD DEPARTURE UNDER U.S.S.G. § 4C1.1.**

Under U.S.S.G. §4C1.1, a defendant who was not engaged in a continuing criminal enterprise (as defined in 21 U.S.C. § 848) and who meets the criteria set forth below is entitled to a two-level reduction of his or her offense level:

a.   the defendant received no criminal history points under Ch. Four Part A;

b.   the defendant did not receive an adjustment under § 3A1.4;

c.   the defendant did not use violence or credible threats of violence in connection with the offense;

d.   the offense did not result in death or serious bodily injury;

e.   the offense of conviction is not a sex offense;

f.   the defendant did not personally cause substantial financial hardship;

g.   the defendant did not possess... a firearm or other dangerous weapon...in connection with the offense;

h.   the offense of conviction is not covered by § 2H1.1;

i.   the defendant did not receive an adjustment under §§ 3A1.1 or 3A1.5; and

2

  j.  the defendant did not receive an adjustment under § 3B1.1. for Aggravating Role.

Mr. De La Torre was not engaged in a continuing criminal enterprise, has zero criminal history points, and meets each of the criteria listed above. If he receives a two-level reduction pursuant to §4C1.1, as the Amended PSI acknowledges he is entitled to (DE 132-2 at 1), taking into account the loss reflected in the PSI and all other previously applied reductions and enhancements, his total offense level will be reduced to Level 20, which corresponds to an advisory guideline range of 33 to 41 months.

**II. CONSIDERATION OF THE 3553(A) FACTORS WARRANTS A DOWNWARD VARIANCE**

The Supreme Court encourages sentencing courts to exercise discretion in imposing a just and fair sentence. *See, e.g.*, *Spears v. United States*, 555 U.S. 261, 264-65 (2009); *Rita v. United States*, 551 U.S. 338, 351 (2007); *Kimbrough v. United States*, 552 U.S. 85, 110-11 (2007); *United States v. Booker*, 543 U.S. 220, 245-46 (2005). A sentencing court's duty is to consider the factors identified in 18 U.S.C. § 3553(a), of which the advisory guidelines are just one consideration, and "impose a sentence sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. *Kimbrough*, 552 U.S. at 90. A "sentencing judge may not perfunctorily impose a guidelines sentence or even presume that such a guidelines sentence is appropriate in a given case." *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015). Consideration of the § 3553(a) militates strongly in favor of a noncustodial sentence for Mr. De La Torre.

*The History and Characteristics of the Defendant*

The first of the 3553(a) factors recognizes that a defendant's history and characteristics may support a downward variance and should be afforded the same weight as the nature and circumstances of the offense. *United States v. Rodriguez*, 724 F. Supp. 1118, 1119 (S.D.N.Y. 1989).

As the letters from his friends and family reflect, Mr. De La Torre is, first and foremost, a dedicated family man. He and his wife, Yumet, have been married for more than three decades. They were middle-school sweethearts who went their separate ways, only to reconnect years later. (Letter from Y. De La Torre). By that point, Yumet was the divorced mother of twin eight-month-old daughters, Emily and Stephanie, whose biological father had all but abandoned them soon after their birth. (Letter from S. Asqueri). Few 21-year-olds would willingly choose to take on another man's infant daughters, but 21-year-old Mario De La Torre didn't hesitate. He seamlessly stepped into the role of father, caring for both girls as though they were his own. In the years since, he has been the central male figure in the girls' lives, providing for them financially and emotionally when their own father could not.

So close is their relationship that Emily and Stephanie hesitate to refer to Mr. De La Torre as their stepfather because it "contradicts the role he has played in [their] life." (Letters from E. Asqueri, S. Asqueri). Rather, Mr. De La Torre's "love and commitment have cemented him in [their] life as [their] father." *Id.* As Emily writes:

> Whenever I have needed support in my life, my dad has been there for me. Whether it was taking me to my various doctor's appointments…of which there were many, helping me move into my college dorm…and subsequent years of moving into various apartments across the country, supporting me through my Crohn's Disease diagnosis…where we finally had some answers, and helping me pick up the pieces after my divorce…when it felt like everything was crashing down around me, I have always known I could count on my dad to be there for me.

*Id.* Similarly, Stephanie writes:

> [I]f there's an emergency, we all know to call dad. Partially because our mom is notorious for not picking up the phone, but mostly because he's going to help us stay grounded in reality while offering sage advice. I have always run to my dad when I'm having an existential crisis, or when I'm deep in depression, or scared, or feeling like I've lost sight of my path in life. He's walked me back from the edge more times than I can count. My dad is the kind of person who will listen to your anguish, sympathize, and then say the right words to motivate you to pick up your feet, get moving, and stop wallowing in your misery.

4

(Letter from S. Asqueri).

After Mr. De La Torre and Yumet were married, they welcomed a third daughter, Samantha. Like her sisters, Samantha flourished amid her father's "patience, love, and never-ending support." (Letter from S. De La Torre). Mr. De La Torre, Samantha writes, "is the reason for my confidence, independence, and strength. Knowing I have someone like him supporting me and sharing my successes and failures has truly meant a lot to me throughout the years." *Id.*

This same sentiment is echoed time and again, in letter after letter. They describe Mr. De La Torre as the "rock" of their family (Letters from B. Blumhardt, Y. De La Torre, Maria Fernandez), a "mentor" (Letter from Matthew Fernandez), and a "pillar of strength, positivity, and guidance." (Letter from L. Fernandez). He has a way, they write, of helping those around him through very dark times and "lifting everyone's spirits." (Letter from Matthew Fernandez). As his niece, Amanda, writes:

> I was diagnosed with depression and anxiety at 17 years old. When Mario heard of this diagnosis, he called me and reminded me that I always had someone to lean on if times ever became tough or if I ever just needed someone to cheer me up. Four years later, Mario still checks up on me and calls just to see how I am doing. At least once a week I receive motivational videos from Mario that have given me the confidence to excel on exams or simply just remind me that I have a purpose. Sometimes just knowing you have someone who cares for you that deeply is enough to turn around a bad day. My uncle has taught me ways to soothe my panic attacks and has been a constant source of support for me as I navigate my way through college and my mental health journey.

(Letter from A. Fernandez).

Mr. De La Torre's kindness and generosity of spirit extend well beyond his family. Yumet tells of how her husband "provides meals at Thanksgiving for 50+ people, buys toys for a couple of the kids on the Christmas wish list, and puts backpacks with back-to-school supplies for foster kids in our community;" how he "buy[s] food [for] the homeless" and has even "walk[ed] into a restaurant with a homeless person and paid for a sit-down meal for them;" and how on one occasion, he "pulled

5

up to a Pet Smart and … bought a bag of dog food because he saw a homeless person with a dog." (Letter from Y. De La Torre). And his daughter, Stephanie, tells of the time on vacation when they saw a hotel housekeeper "start walking with all her belongings outside. Without hesitation, my dad asked her if she needed a ride, so we drove her to her destination, and my dad then proceeded to give her money to make sure she could buy herself lunch and a ride back home safely. (Letter from S. De La Torre).

These and stories like it reveal the person Mr. De La Torre is: humble, loyal, principled, and an "inherently good man." (Letters from C. Delatorre, S. De La Torre, & C. Rodriguez). His offense of conviction was entirely out of character and borne of his desire to fund his daughters' college and post-graduate educations. (Letter from Y. De La Torre). Ashamed of himself and his catastrophic lapse in judgment, Mr. De La Torre has taken it upon himself to apologize personally to each member of his family for his actions and for falling short of what they, and he, expect of him. As his cousin writes:

> I have seen an overwhelming sense of remorse from Mario. I do not feel that he owes me a personal apology but he felt the need to tell me how deeply sorry he is for his actions. This situation has caused him significant mental anguish for a very long time. I know he will never get caught up in something like this again. He understands where he was at-fault and is committed to making positive impacts in his life and in the community going forward.

(Letter from C. Rodriguez).

Beyond apologizing to those closest to him, Mr. De La Torre has pleaded guilty to and accepted responsibility for his crimes, fully appreciating the damage that his actions caused. As a sign of his acceptance, he has been providing substantial assistance to the government since last year, which will continue after sentencing, and which has convinced the United States to file a downward departure motion under U.S.S.G. § 5K1.1 on his behalf. Apart from his substantial assistance to law enforcement, which we will detail at sentencing, Mr. De La Torre has fully

6

complied with the terms of his pretrial release, and has maintained gainful employment despite not being allowed to travel internationally while on bond, a key work requirement for someone working in aviation-related sales. One of those employers, from whom Mr. De La Torre unfortunately was forced to separate because of his inability to travel internationally while on pretrial release, writes:

> During the time that Mario worked for our company, he always displayed a high level of integrity, responsibility, and ambition. Mario was a strong leader within our organization and cared about the people he worked with. He was a dedicated employee at S3 AeroDefense, and always strived to do the right thing in every situation. I have always known Mario to be honest and kind and was very well trusted and respected by his colleagues, leadership and myself.

(Letter from S. Lovy).

### *The Nature of the Offense*

Amid Summit Aerospace's refusal to pay him the full salary and commissions he was entitled to as senior vice president of sales and marketing, Mr. De La Torre acknowledges that he devised a scheme in which he falsely credited an outside sales consultant, Joe McHomes, with securing contracts and purchasers from one particular customer, RGTS, for Summit's benefit; that he submitted false invoices to Summit on McHomes' behalf for the standard 10-percent commission that Summit paid to its outside sales consultants; that Summit thereafter issued commission payments to McHomes totaling just over $2.1 million; that he received roughly half that amount back from McHomes; and that he failed to account for those funds on his tax filings. Although we are in no way attempting to excuse his actions, the unique circumstances surrounding the offense and prosecution provide important context.

While we do not dispute the government's loss amount, the advisory guidelines, driven by that loss calculation, overstate the seriousness of the offense. As noted above, of the $2.1 million Summit paid out in unearned commissions, Mr. De La Torre received only half. But even

7

the $2.1 million figure pales in comparison to the tens of millions of dollars that Summit earned on these contracts with RGTS – agreements Summit was only able to secure because of Mr. De La Torre's sourcing and sales work.

In addition, the misconduct to which Mr. De La Torre pleaded guilty dates back to 2008, with the overwhelming majority of the offense conduct occurring before February 11, 2017, more than five years before the Superseding Indictment was returned. In fact, of the $2.1 million in unlawful commission payments arranged by Mr. De La Torre, less than $188,000 were paid out after February 2017, of which he kept half. While we understand that this Court is free to consider losses outside of the limitations period, given the complex procedural history of this case – the years-long delay in bringing charges, the legally invalid 2020 Information, and the additional delay preceding the Superseding Indictment – this Court suggested in 2023 that it would not consider losses beyond 2017. Should the Court follow suit, Mr. De La Torre's advisory guidelines would be reduced by more than six levels and his guideline range would be 15 to 21 months.

### *The Need to Avoid Unwarranted Sentence Disparities*

Section 3553(a)(6) requires sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This factor "concerns national disparities between defendants with similar criminal histories convicted of similar conduct…." *United States v. Conatser,* 514 F.3d 508, 521 (6th Cir. 2008). According to data collected by the United States Sentencing Commission, defendants like Mr. De La Torre – those aged 51 to 60 who committed similar offenses during the same time frame (fiscal years 2015 to 2023), who fell within the same criminal history category, and whose advisory

guideline range, calculated in accordance with U.S.S.G. § 2B1.1, fell within Zone D – more than eleven percent were sentenced to no prison time.[2]

### *The Need to Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public*

Section 3553(a) grants this Court wide discretion in fashioning a sentence that is "sufficient, but not greater than necessary" to provide just punishment, afford adequate deterrence, and protect the public. In Mr. De La Torre's case, a noncustodial sentence would achieve each of these goals.

When it comes to just punishment, it is critical to note that for the better part of four years, Mr. De La Torre has been living in his own personal prison. His decisions and movements have largely been regulated by the Court and Probation Office. He has been unable to travel internationally, a necessary component of his role as an aviation sales representative and has twice lost his job and his livelihood as a result. He also has lived with the scrutiny, anxiety, and uncertainty that comes with being publicly named as a defendant in a criminal case. Imposing a sentence of imprisonment on top of what Mr. De La Torre has endured these last few years would be greater than necessary to punish him for his misdeeds.

Indeed, the Supreme Court has recognized that defendants who receive noncustodial sentences are subject to "several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). They are prohibited from traveling outside the judicial district, from moving or changing jobs without approval, and from associating with any person convicted of a felony. *Id.* They are required to report regularly to their Probation Officer, must

---

[2] *See* U.S.S.C. Interactive Data Analyzer, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Jun. 20, 2024). Of those who were sentenced to prison, nearly forty percent received sentences of less than two years. *Id.*

allow unannounced visits to their home, and are required to maintain full-time employment. *Id.* And they face lifetime restrictions as a federal felon.

In terms of deterring future misconduct, the Supreme Court has been clear that sentencing courts need not impose longer or harsher sentences in order to "promote respect for the law." *Id.* at 54. Studies have shown that increasing the severity of a person's sentence does little to deter future crime. U.S. Dep't of Justice, Nat'l Inst. Of Justice, *Five Things About Deterrence* (May 2016) (*citing* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, Crime and Justice: A Review of Research, vol. 43 (2013)). Further, lengthy prison sentences are actually less likely to reduce the likelihood of recidivism. Valerie Wright, *Sentencing Project*, Deterrence in Criminal Justice: Evaluating Certainty v. Severity in Punishment 7 (2010) (finding that "[a]mong low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences.").

In the same way that sentencing Mr. De La Torre to a term of imprisonment would not deter future crime, nor would it impact his risk of recidivism, which is all but zero. *Rodriguez*, 724 F. Supp. at 1120 (recognizing that section 3553 "envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes."); *see also United States v. Shanshan Du*, 570 F. App'x 490, 508 (6th Cir. 2014) (granting downward variance, in part, based on the unlikelihood of recidivism). He has never been arrested, let alone convicted, of any crime – further proof that his actions were entirely aberrational. *United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (noting that a defendant's lack of criminal history can be the basis for a variance even though it has already been factored into guideline calculation). As the United States Sentencing Commission's studies reflect, Mr. De La Torre is among offenders least likely to re-offend. *See Recidivism Among Federal Offenders, A*

10

*Comprehensive Overview; Recidivism and the "First Offender,"* all available at https://usc.gov/research (noting that first offenders, married defendants, defendants over 40 years old, and nonviolent offenders are all individually among the least likely to re-offend).

## CONCLUSION

For the reasons set forth herein, Defendant Mario De La Torre respectfully requests that this Court impose a noncustodial sentence.

Respectfully submitted,

/s/ Jeffrey E. Marcus
Jeffrey E. Marcus
Fla Bar No. 310890
**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
2 South Biscayne Boulevard, Suite 2530
Miami, Florida 33131
Telephone: (305) 400-4260
jmarcus@mnrlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2024, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record.

/s/ Jeffrey E. Marcus
Jeffrey Marcus